**David MUNOZ, Petitioner,**

v.

**KEANE, Respondent.**

**Zoilo LINARES, Petitioner,**

v.

**SENKOWSKI, Respondent.**

Nos. 91–CIV–0954 (LJF), 91–CIV–3195 (LJF).

United States District Court, S.D. New York.

Nov. 4, 1991.

David Munoz, pro se.

Simpson Thacher & Bartlett by John J. Kenney, Andrew S. Amer, New York City, for petitioner Zoilo Linares.

Robert M. Morgenthau, Dist. Atty., New York County by Nikki Kowalski, Asst. Dist. Atty., New York City, for respondents.

## ORDER AND OPINION

FREEH, District Judge.

In these related cases, *Linares v. Senkowski* (91–CIV–3195) and *Munoz v. Keane* (91–CIV–0954), petitioners Zoilo Linares ("Linares") and David Munoz ("Munoz") seek writs of habeas corpus, primarily on the grounds that their prosecution by an individual not admitted to the bar of New York or any other state violated the due process clause of the federal constitution.[1] Linares and Munoz were codefendants, tried by the same prosecutor, in a single trial. For the reasons stated below, the petitions are denied.

## FACTS

On November 9, 1985, Linares and Munoz were arrested with four other individuals[2] and charged with first degree criminal possession and criminal sale of a controlled substance (cocaine). In May 1986, Linares and Munoz were tried on those charges along with Rosero and Sanchez–Medina,[3] and on June 19, 1986, they were convicted on both counts. Linares was sentenced to concurrent prison terms of seventeen years to life, and Munoz was sentenced to concurrent terms of twenty years to life.

The prosecutor that tried Linares and Munoz on behalf of the People of New York was Daniel J. Penofsky ("Penofsky"), a former assistant district attorney in the Special Narcotics Prosecutor's Office. An investigation conducted by the District Attorney's office in March 1989 disclosed that

---

1. Both Linares and Munoz also raise other grounds for reversal of their convictions. Those additional grounds will be discussed below.

2. Edimer Rosero ("Rosero"), Elmer Sanchez–Medina ("Sanchez–Medina"), Irma Posada ("Posada") and Livia Del–Rosario ("Del–Rosario").

3. Posada and Del–Rosario pled guilty.

while Penofsky had graduated from law school, he had never been admitted to practice law in New York, that he had never sat for and thus never passed the New York bar examination, and that he had never submitted the documents necessary to obtain admission to the New York bar upon waiver of the examination requirement. *People v. Munoz,* 153 A.D.2d 281, 550 N.Y.S.2d 691, 692 (1st Dept.1990). Once this information became public, Penofsky resigned as an assistant district attorney. *Id.*

Both petitioners claim that because Penofsky was not an attorney admitted to practice law in New York, their trial was inherently unfair, in violation of the due process clause of the 14th amendment.[4] Both petitioners have also raised these claims in state court.[5]

## DISCUSSION

### 1. *The Constitutional Claims*

Linares and Munoz both claim that their prosecution by a "layman" deprived them of the safeguards necessary to ensure a fair trial. According to petitioners, the

---

**4.** On direct appeal, both petitioners also sought to have their indictments dismissed, arguing that an unadmitted prosecutor's presentation of a case to the grand jury constitutes the presence of an unauthorized person during grand jury proceedings, in violation of CPL 190.25(3)(a). Both the Appellate Division and the New York Court of Appeals rejected this claim, which petitioners do not reassert here. *See People v. Carter,* 77 N.Y.2d 95, 564 N.Y.S.2d 992, 996, 566 N.E.2d 119, 123 (1990); *People v. Munoz, supra,* 550 N.Y.S.2d 691, 693 (1st Dept.1990); *People v. Linares,* 158 A.D.2d 296, 550 N.Y.S.2d 703 (1st Dept.1990).

**5.** On February 6, 1990, the Appellate Division, First Department affirmed both convictions. *Munoz, supra,* 550 N.Y.S.2d 691 (1st Dept.1990); *People v. Linares,* 550 N.Y.S.2d 703 (1st Dept. 1990). On March 29, 1990, the New York Court of Appeals denied both Linares' and Munoz' requests for leave to appeal. 75 N.Y.2d 921, 555 N.Y.S.2d 39, 554 N.E.2d 76,75 N.Y.2d 922, 555 N.Y.S.2d 41, 554 N.E.2d 78. The Court of Appeals specifically stated, however, that petitioners would be permitted to renew their applications pending the outcome of another appeal involving the same unadmitted prosecutor, *People v. Carter,* 77 N.Y.2d 95, 564 N.Y.S.2d 992, 566 N.E.2d 119 (1990).

fact that Penofsky committed fraud in representing himself as an attorney indicates that he did not and could not comply with the constitutionally-imposed obligations of a prosecutor, such as the prosecutor's duty to (1) review evidence favorable to the accused, *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); (2) disclose to the defense all witness statements relating to a witness' testimony, *Jencks v. United States,* 353 U.S. 657, 672, 77 S.Ct. 1007, 1015, 1 L.Ed.2d 1103 (1957); and (3) when challenged, present a neutral explanation for any apparently discriminatory use of peremptory challenges during jury selection. *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). (Linares Petition at 15–16).[6]

■ Petitioners are correct in asserting that prosecutors have numerous obligations of constitutional dimensions.[7] The Supreme Court has repeatedly emphasized that "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much [a prosecutor's] duty to refrain from improper methods calculat-

---

The Court of Appeals decided *Carter* on November 29, 1990, and held that, in the absence of a showing of prejudice to the defendant, a prosecutor's non-lawyer status does not constitute a denial of due process. *Id.* 564 N.Y.S.2d at 997. Following that decision, Linares and Munoz renewed their applications for leave to appeal, claiming that they could demonstrate prejudice. On January 11, 1991, the court denied Linares' application, 77 N.Y.2d 840, 567 N.Y.S.2d 209, 568 N.E.2d 658, and on February 19, 1991 also denied Munoz'. 77 N.Y.2d 880, 568 N.Y.S.2d 923, 571 N.E.2d 93.

**6.** As indicated above, Munoz is proceeding here *pro se,* while Linares has obtained private counsel. Munoz has submitted no briefs in support of his habeas petition. We assume for purposes of this decision, however, that Munoz' constitutional claims are identical to Linares' and rely on the substantial memorandum of law submitted by Linares' counsel in assessing those claims.

**7.** Prosecutors are also subject to substantial ethical restrictions. *See Imbler v. Pachtman,* 424 U.S. 409, 429, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976) (granting prosecutors absolute immunity from future civil actions, in part because of prosecutors' ethical obligations, citing ABA Code of Professional Responsibility).

ed to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

█ Petitioners claim that their trial was not a "fair legal proceeding, as required by the Due Process Clause" because "[e]ach statement and representation uttered by Penofsky during the course of the trial and ... pre-trial discovery is tainted by his unlawful conduct." (Linares Petition at 15). In essence, petitioners have formulated a new constitutional right—the right to be prosecuted by a licensed attorney. Apparently, no federal court has ever recognized such a right under the due process clause of the fourteenth amendment.

Petitioners cite only one state case, *People v. Munson*, 319 Ill. 596, 150 N.E. 280 (1925), imposing a requirement that a prosecuting attorney be licensed. In *Munson*, the Illinois Supreme Court vacated a criminal conviction on the grounds that the prosecutor was not an admitted attorney. In reaching that result, the Court noted that neither the state constitution nor any state statute required a criminal defendant to be prosecuted by a licensed attorney. 150 N.E. at 281. Nevertheless, the Court imposed such a requirement as a matter of common law, stating:

> [The state's attorney] is intrusted with broad official discretion. He is given power to file informations, sign indictments, and to sue out writs of subpoena and summons, thereby, in a measure, exercising the power of the court in representing the people in their cases. Both logic and the weight of authority require that one who discharges those duties have the qualifications of such an officer ... [I]f he be an attorney for the people, he must be qualified to represent his client at law. [*Id.* at 281–82.]

Despite the broad language quoted above, *Munson* is not analogous to this case. The central issue in *Munson* was the validity, as a matter of state law, of an indictment obtained by an unlicensed attorney. 150 N.E. at 280. The New York courts have already addressed that question in *Carter*. Moreover, the Illinois court did not even discuss whether any federal constitutional rights were threatened by the prosecutor's unadmitted status.

Contrary to petitioners' claims, a prosecution conducted by an unlicensed attorney does not "violate[] a defendant's right to fair procedure [or] deprive[] him of constitutional safeguards guaranteed under the Due Process Clause." (Linares Petition at 13). The due process clause requires a fair trial, not a perfect one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). While it is obviously preferable that a prosecutor be licensed to practice law in the jurisdiction in which he or she practices, the fact that a prosecutor is not admitted does not necessarily undermine the fairness of the trial process.[8]

█ Of course, the Second Circuit has found that the opposite does not hold true, and requires that a criminal defendant be represented by an admitted attorney. *See United States v. Novak*, 903 F.2d 883 (2d Cir.1990) (reversing conviction where defense counsel obtained bar admission by false pretenses); *Solina v. United States*, 709 F.2d 160 (2d Cir.1983) (same; defense counsel never admitted to the bar). However, defense counsel's distinct role in a criminal proceeding justifies treating the two situations differently.

A criminal defendant's right to counsel is a fundamental constitutional right, basic to a fair trial. *See* U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). "Assistance of counsel is mandated by the Sixth

8. Petitioners put great emphasis on the existence of ethical sanctions as a "check on Penofsky's exercise of the prosecutorial power." (Linares Petition at 15). While it is true that an unlicensed attorney, Penofsky was not subject to professional discipline, other "checks" on his behavior did exist. Not only were all the normal constitutional protections applicable to a criminal prosecution in effect here, Penofsky, like all prosecutors, had to be aware that were he to abuse his power and violate a defendant's constitutional rights, the conviction would likely be overturned either on direct appeal or by collateral attack.

2

86

Amendment because lawyers 'are the means through which the other rights of the person on trial are secured,' and through which the prosecution's case is subjected to 'meaningful adversarial testing.' " *Novak,* 903 F.2d at 886 (*quoting United States v. Cronic,* 466 U.S. 648, 653, 656, 104 S.Ct. 2039, 2043, 2045, 80 L.Ed.2d 657(1984)). Defense counsel's sole responsibility in a criminal trial is to protect the defendant's interests.

By contrast, a prosecutor acts as a criminal defendant's adversary. While a prosecutor is obligated to seek justice, not only a conviction, a criminal defendant does not rely on a prosecutor to protect his rights. As a result, the fact that a prosecutor may be unlicensed to practice law has far fewer repercussions for the defendant than if his own counsel is not admitted. Where, as here, defense counsel and an impartial trial judge are capable of monitoring the prosecutor's conduct in order to ensure that no constitutional violations occur, it would be inappropriate to conclude that a due process violation automatically results from the prosecutor's unlicensed status.[9]

■ The rationale for the new constitutional right proposed by petitioners is, presumably, that a prosecutor who lies about his bar admission cannot be trusted and may lie about other matters. That rationale, while facially appealing, could be used to overturn convictions even where the prosecutor is an admitted attorney if a criminal defendant can obtain evidence of other "dishonest" behavior on the part of the prosecutor, such as a failure to pay parking tickets or failure to file timely income tax returns. While this type of dishonest conduct on the part of a prosecutor is undesirable and may in fact lead to a prosecutor's dismissal, it is not grounds for a presumption that whenever a prosecutor "lies" about any matter—whether related to the criminal prosecution or not—criminal proceedings conducted by that prosecutor during the time of the dishonest conduct were unfair. Such a rule would effectively put prosecutors on trial, a complete reversal of the normal procedure for criminal prosecutions.

We also cannot ignore the practical implications of accepting petitioners' due process claim—every defendant convicted by Penofsky during his fourteen-year tenure as a prosecutor would be entitled to a new trial. Petitioners have not demonstrated a sufficient basis for invalidating such a large number of cases and have not suggested any way to limit the scope of their proposed constitutional rule. Accordingly, we decline to adopt it.

■ Even if we were to accept that there is a constitutional right to be prosecuted by a duly admitted attorney, an alleged constitutional violation will be considered harmless error unless that violation constitutes a "structural defect[ ] in the constitution of the trial mechanism" rather than "an error in the trial process itself." *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Unlike the right to defense counsel or trial before an unbiased judge, constitutional rights "so basic that their infraction can never be treated as harmless error," *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824–27, 17 L.Ed.2d 705 (1967), the "right" asserted here—to be prosecuted by an attorney licensed to practice law—does not qualify as a "structural defect ... [in] the trial mechanism." Accordingly, reversal of petitioners' convictions is only appropriate if petitioners can demonstrate that Penofsky's conduct prejudiced them in some way.

Petitioners cannot show any such prejudice. No one disputes that Penofsky's conduct in misrepresenting himself as an admitted attorney was reprehensible and a clear violation of New York Judiciary Law § 478, which makes it unlawful for any unlicensed person to appear as an attorney-at-law. However, petitioners have not shown that Penofsky's status impacted his

**9.** Under a number of recent Supreme Court decisions, it is especially inappropriate for federal courts to recognize "new" constitutional rights in the context of a habeas corpus petition.

*See Sawyer v. Smith,* —— U.S. ——, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

prosecution of this case. In the absence of any evidence that Penofsky failed to meet his constitutional obligations to petitioners, the requested relief must be denied.

■ Petitioners have also requested leave to take discovery to establish facts that would demonstrate they were prejudiced by Penofsky's conduct. The rules applicable to habeas corpus petitions state that, with leave of the court, a petitioner may employ all the discovery tools available under the Federal Rules of Civil Procedure. 28 U.S.C. § 2254, rule 6. Leave to conduct discovery should be granted to habeas petitioners only for good cause shown. *Id.*

Petitioners have not demonstrated any such "cause." Petitioners make only generalized statements about the possible existence of exculpatory *Brady* material that Penofsky may have withheld. Similarly, petitioners claim that they may be able to discover some evidence suggesting Penofsky deliberately acted to exclude minorities from the jury. (See discussion below). However, petitioners are not entitled to go on a fishing expedition through the government's files in the hopes of finding some damaging evidence. Because petitioners have not produced any specific evidence that supports their claims that *Brady* materials or evidence of discrimination exists, no discovery will be permitted.

## 2. *Discriminatory Use of Peremptory Challenges*

Both Linares and Munoz [10] claim that Penofsky exercised his peremptory challenges to discriminate against minorities, in violation of the equal protection clause of the fourteenth amendment. *Batson v. Kentucky, supra,* 476 U.S. 79, 106 S.Ct.

1712, 90 L.Ed.2d 69 (1986). After Penofsky had exercised eleven peremptory challenges, counsel for Linares objected that the prosecutor was using those challenges to exclude all Blacks and Hispanics from the jury. (Linares Petition at 23).[11] After a colloquy between counsel, the trial court stated that there had been no indication of discriminatory conduct on the part of either party. (*Id.* at 24). Jury selection continued and when complete, Penofsky had exercised peremptory challenges against one Hispanic juror (Maria Romano), one possibly Hispanic juror (Ms. Acensio), and three additional Black and Hispanic jurors. *Munoz,* 550 N.Y.S.2d at 694. Penofsky had also exercised a peremptory challenge against a juror he had initially sought to challenge for cause, on the grounds that her participation in an anti-apartheid demonstration demonstrated that she was hostile to police witnesses. (Linares Petition at 24). Petitioners now reassert their claim, raised at trial and on direct appeal, that Penofsky sought systematically to exclude minority groups from the jury. (Linares Petition at 25).

■ In order to make out a *prima facie* case of discrimination under *Batson,* petitioners must show (1) that they are members of a cognizable ethnic group; (2) that the prosecutor exercised his peremptory challenges to exclude members of that ethnic group from service on the jury; and (3) that the prosecutor's challenges and other conduct raise an inference that the prosecutor intentionally excluded potential jurors on the basis of race. 476 U.S. at 96, 106 S.Ct. at 1723. Petitioners cannot satisfy this standard. Although petitioners are Hispanic, which is a cognizable ethnic group, *United States v. Rudas,* 905 F.2d

**10.** Respondent argues that Munoz "forfeited" his right to raise this and any claims other than the challenge regarding Penofsky's bar status. (Respondent's Brief at 30). In his original appeal to the New York Court of Appeals, Munoz raised all of the claims asserted here. Munoz failed, however, to include all such claims in his renewed appeal to that Court after the *Carter* decision. (Respondent's Brief at 30–31). Technically, such a failure may be grounds to foreclose consideration of those claims by this Court. *Grey v. Hoke,* 933 F.2d 117 (2d Cir.1991).

However, we must address at least one of Munoz' other arguments in any event because Linares raises it as well. Accordingly, we will also address Munoz' remaining constitutional claim.

**11.** The *voir dire* record has apparently been misplaced. (Linares Petition at 23 n. 11). For purposes of this outline of events, we rely on Linares' statement of facts and the Appellate Division's account in *Munoz.*

38, 41 (2d Cir.1990), they have not demonstrated that Penofsky exercised his peremptory challenges to exclude members of that ethnic group.[12] As noted above, at least one Hispanic woman was selected as a juror. In addition, at least two of the jurors ultimately chosen were Spanish-speaking, and another was Filipino. *Munoz,* 550 N.Y.S.2d at 694.

■ In addition to being misplaced, the *voir dire* "record" before the Court is so unreliable as to defeat petitioners' *Batson* claims. No systematic effort was made during jury selection to determine the races of potential jurors. The *Batson* claims are based instead on trial counsel's statements, *after voir dire* was completed, that Penofsky had struck seven Black and Hispanic jurors. That counsel utilized the subjective and unreliable criteria of surnames is obvious from his statement that "Romano" is a Hispanic name, when it may well have been an Italian derivative.[13] Moreover, the names of any married women on the panel may have denoted their husband's ethnicity rather than their own. The record also reflects that one of the jurors challenged by Penofsky was Irish, despite co-counsel's initial complaint that another minority member was being excluded.

In sum, the record below regarding petitioners' *Batson* claims does not support a reasonable inference that Penofsky excluded jurors on account of their race. Indeed, the trial judge, who was present during jury selection and had the opportunity to observe Penofsky's conduct first-hand, determined that Penofsky was not excluding potential jurors based on their race. Given the other relevant circumstances, including the composition of the jury finally selected, petitioners have not made out a *prima facie* showing that the prosecutor contravened the *Batson* rule. Thus, the burden never shifted to the prosecutor to come forward with a racially neutral explanation for his challenges. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

### 3. *Ineffective Assistance of Counsel*

■ Linares' final claim is that he was denied effective assistance of counsel when his trial attorney failed to investigate possible alibi witnesses and gave an inadequate closing argument. (Linares Petition at 31). The standard for ineffective assistance of counsel is stringent. Linares must demonstrate not only that defense counsel's conduct fell below an objective standard of reasonableness, he must also show that but for defense counsel's errors, the result of the trial would likely have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Nothing presented by Linares suggests either that his trial attorney's presentation of the case was inadequate or that the result of the case would have been different had defense counsel acted differently. Linares' attorney apparently failed to investigate and present three witnesses who stated that they would have testified that Linares was attending a party with them on the night of the alleged drug sale. (Linares Petition at 32–34). Given the overwhelming evidence that Linares participated in the drug transaction at issue,[14] it was reasonable for defense counsel to conclude, as a strategic matter, that presenting testimony of the alleged alibi witnesses

---

**12.** In their papers, petitioners also focus quite heavily on Penofsky's conduct with regard to Black jurors. There is no indication that Penofsky deliberately excluded Black jurors on the basis of race.

**13.** Although the Second Circuit has apparently not addressed the issue, other courts have specifically found that "the spelling of a person's surname is insufficient—standing alone—to show that he or she belongs to a particular ethnic group." *United States v. Campione,* 942 F.2d 429, 433 (7th Cir.1991).

**14.** The prosecution presented the testimony of Detective Jose Franceschi, Special Agent Jefferson Moran, and Eduardo Flores, a confidential informant. These witnesses testified that they met with Linares to set up the drug sale, went with him to an apartment building (along with a number of co-defendants) and ultimately purchased the drugs from Munoz and some co-defendants outside that apartment building. According to the testimony, Linares was an active participant in the sale, who was present at the location where the sale was made, even if he was not directly responsible for that sale.

would be damaging to Linares' case. Moreover, had all three witness testified consistently with their affidavits submitted by Linares, the result of the trial would not likely have been different.

Defense counsel's summation was also more than adequate. Given the strength of the prosecution's evidence, defense counsel could do little more than challenge the credibility of the prosecution's witnesses and question the procedures followed by the police, which he did. Linares was not denied effective assistance of counsel in this regard.

### 4. *Failure to Permit Witness to Testify*

█ Munoz' final constitutional claim [15] is that he was deprived of the right to present witnesses. According to Munoz, the trial court refused to grant an adjournment in order that he might locate a defense witness, and further refused to permit that witness to testify when she arrived in court.

On the last day of the People's case, Munoz requested a one-day adjournment so that he could locate a Martha Cecelia ("Cecelia"), a witness who would testify on his behalf. The trial court granted that request. The following morning, Cecelia failed to appear, and counsel requested a final adjournment until 11:00 a.m. The court waited until 11:07 a.m., and, when the witness had not yet arrived, ordered defense counsel to begin their closing statements. Cecelia apparently appeared in court at 12:30 p.m., but because the court was on lunch break, it was not notified of her presence until 2:00 p.m. At that point, the trial court refused to allow the evidence to be reopened to permit her to testify. *Munoz*, 550 N.Y.S.2d at 694.

The trial court did not abuse its discretion or deny Munoz a fair trial by making this ruling. By the time Munoz' witness arrived at court, defense counsel had been giving closing statements for at least an hour and a half. In fairness to the other defendants, the trial court would have had

to permit any defense counsel who wished to alter their statement an opportunity to do so after the witness had testified. After having already afforded Munoz a reasonable opportunity to locate his witness and have her present to testify, the trial court was not required to continue to delay the trial and reopen the evidence, particularly where the witness' testimony was only tangential to guilt or innocence. (Respondent's Brief at 43) (defense counsel represented that witness would testify that undercover police officer drank beer and asked co-defendant for pills prior to arrest).

For the foregoing reasons, the petitions are denied in all respects.

SO ORDERED.

---

**15.** Munoz also challenges the adequacy of the indictment. Because this claim does not raise an issue of federal constitutional law, as re-

quired by 28 U.S.C. § 2254(a), it cannot be considered here.