*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A12-2214**

State of Minnesota,
Respondent,

vs.

Ahavel Abimbola Scherz,
Appellant.

**Filed August 18, 2014
Affirmed
Chutich, Judge**

Washington County District Court
File No. 82-CR-12-1275

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Peter J. Orput, Washington County Attorney, Peter S. Johnson, Assistant County Attorney, Stillwater, Minnesota (for respondent)

Glenn P. Bruder, Mitchell, Bruder & Johnson, Edina, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Rodenberg, Judge; and Stoneburner, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**CHUTICH**, Judge

Appellant Ahavel Abimbola Scherz appeals her convictions of aiding and abetting gross misdemeanor malicious punishment of a child and aiding and abetting misdemeanor domestic assault. She asserts that the district court erroneously instructed the jury, the evidence is insufficient to support the convictions, and she received ineffective assistance of counsel. Because the district court properly instructed the jury, the evidence supports the jury's determinations, and Scherz has not shown that her trial counsel was ineffective, we affirm.

## FACTS

In 2009, Scherz began dating Garret Jensen, the father of two children, K.J. and A.J. In 2012, when K.J. was thirteen years old, she and her brother A.J. spent half of each week at Jensen's house in Woodbury and half of each week at their mother's house in Wisconsin. Scherz kept clothes at Jensen's house and received mail there; she sometimes stayed overnight; and her driver's license listed Jensen's house as her address. She went on vacations and did many activities with K.J. and A.J., including helping them with homework.

On April 1, 2012, Scherz and Jensen confronted K.J. about K.J. taking some of Scherz's clothing. K.J. took some of Scherz's clothes, wore them, and brought some of them to K.J.'s mother's house. As a consequence, Scherz told K.J. that she had to put shorts on and "go on [her] knees and hold up a chair." If K.J. did not keep her arms straight while holding the chair, she "had to be beaten with a spoon, a wooden spoon."

2

K.J.'s father was there when Scherz administered the punishment. With the chair upside down, K.J. held the sides of the seat of the chair, while kneeling on the hard linoleum floor of the dining room near the kitchen. K.J. dropped the chair a few times, and she "was beaten with a spoon for it" and "was spanked a few times also." K.J. testified, "Ahavel [Scherz] would come over with a wooden spoon and whack me until [my arms] were straight." Scherz hit K.J. on her legs and her arms more than six times, and K.J. cried and screamed. K.J.'s father also hit her on her back and her butt "if Ahavel wasn't there." K.J. said that she had to hold the chair for more than two hours. After K.J.'s father told her that she could put the chair down, he told her to clean her room. K.J. said that her body was "[s]ore" and "[h]urt," and she felt like she had been run "over by a truck."

After going to bed that night, K.J. decided to run away with A.J. because she "didn't want to be punished anymore." She took her brother with her because she did not "want him getting hurt"; "he might be punished for me running away"; and "[t]hey might have thought that he knew something, so they [might] try to beat it out of him." K.J. and her brother spent the night in the back of an abandoned truck near Jensen's house. In the morning, K.J. and her brother looked unsuccessfully for somewhere else to stay, but eventually returned to the truck.

After noticing that K.J. and her brother were missing the next morning, Jensen and Scherz went to K.J.'s school to look for them. Scherz and Jensen eventually found K.J. and her brother at the abandoned truck.

To humiliate K.J., Scherz wanted her to wear a shirt to school that day that said "I am a thief." The front of the shirt stated, in capital letters, "My name is [K.] & I am a thief," and the back stated, "I have been stealing my dad's girlfriend's clothes & VS underwear[] to look cool @ school. I am a thief." The writing appears to have been written with marker. Scherz and Jensen brought K.J., wearing the shirt, to school.

Upon arriving at the school, Scherz, Jensen, and K.J. met with the assistant principal, who knew that Scherz and Jensen had been looking for K.J. earlier. When the assistant principal noticed that K.J.'s arms were red and heard that K.J. slept in the woods, she brought K.J. to the school nurse. The assistant principal then spoke with Scherz and Jensen, telling them that the shirt was inappropriate for school. Scherz and Jensen told the assistant principal that "they wanted to punish [K.J.] and humiliate her at school because she had stole[n] clothes from [Scherz]."

The school nurse saw bruises on K.J.'s left leg and discoloration of her knees and noticed the "I am a thief" shirt that K.J. was wearing. K.J. told the nurse about the previous night's events, that she had to hold a chair while kneeling in shorts on a hard floor and that she was hit with a spoon. The school principal and the assistant principal also spoke with K.J., who again consistently recounted the details of her punishment.

The assistant principal immediately reported the punishment to the police. In a later interview with the police, Jensen admitted that he and Scherz decided on the punishment together and that Scherz "may have hit [K.J.] once on the butt" with the wooden spoon.

4

The state charged Scherz with aiding and abetting gross misdemeanor malicious punishment of a child and aiding and abetting misdemeanor domestic assault. *See* Minn. Stat. §§ 609.05, subd. 1, .2242, subd. 1(2), .377, subd. 2 (2010). Scherz's jury trial was held in August 2012. Witnesses for the state included K.J.; the assistant principal; the school nurse; and Sergeant Neil Bauer of the Woodbury Police Department. Jensen and Scherz testified for the defense.

Scherz denied any involvement in the punishment. She denied asking K.J. to kneel and hold the chair. Although she admitted that the punishment occurred, Scherz testified that K.J. kneeled for only "nine to ten minutes" and that Jensen only "tapped" K.J. once on the arm. She denied hitting K.J. and said that it was Jensen's idea for K.J. to wear the shirt.

Jensen testified that K.J. had taken things from his girlfriend more than once, that he had many conversations with K.J. about "not taking things that don't belong to [her]," and that he "had done every punishment [he could] think of" before the punishment with the chair. Jensen claimed that he made K.J. hold a chair above her head for ten minutes while kneeling and that neither he nor Scherz spanked or hit K.J. during that time. Jensen also testified that it was his idea for K.J. to wear the shirt that said "I am a thief."

The jury convicted Scherz of both counts. On the malicious-punishment conviction, the district court sentenced Scherz to 360 days in jail, but stayed 300 days for two years; on the domestic-assault conviction, the district court sentenced Scherz to 90 days in jail, but stayed 30 days for two years.

Scherz petitioned for postconviction relief, arguing that her trial counsel was ineffective. The district court denied her petition. This appeal followed.

## DECISION

### I. Jury Instructions

Scherz asserts that the district court should have instructed the jury that a person acting under the authority of a parent "may impose corporal punishment without committing an assault or imposing malicious punishment." Because Scherz failed "to propose specific jury instructions or to object to [the] instructions" on these grounds, we review for plain error. *State v. Cross*, 577 N.W.2d 721, 726 (Minn. 1998). Under plain-error review, an appellant must show that (1) there was error, (2) the error is plain, and (3) the error affected substantial rights. *Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014). If all three prongs are met, we determine "whether the error should be addressed to ensure the fairness and the integrity of the judicial proceedings." *Id.*

District courts have broad discretion in selecting the language for jury instructions. *State v. Peou*, 579 N.W.2d 471, 475 (Minn. 1998). We view jury instructions in their entirety to decide whether they "fairly and adequately" explain the law of the case. *State v. Broulik*, 606 N.W.2d 64, 68 (Minn. 2000). "An instruction is error if it materially misstates the law." *State v. Moore*, 699 N.W.2d 733, 736 (Minn. 2005).

### A. Malicious Punishment

Scherz contends that the district court erred in its malicious-punishment instructions by (1) not providing "relevant considerations in determining whether a

particular measure of force was 'unreasonable'" and (2) not instructing the jury "that corporal punishment is explicitly permitted under Minnesota law." We disagree.

The district court's instructions follow the statutes on malicious punishment of a child and the permitted use of reasonable force. Minn. Stat. §§ 609.06, subd. 1(6), .377 (2010); *see also* 10 *Minnesota Practice*, CRIMJIG 13.85, 13.86 (2006). The district court explained "unreasonable force" as "such force used in the course of punishment as would appear to a reasonable person to be excessive *under the circumstances*." (Emphasis added.) The jury was instructed to consider the circumstances of the case; the statute does not require that the jury be instructed to consider certain identified or specific circumstances in deciding reasonableness. *See* Minn. Stat. § 609.377, subd. 1.

The district court also instructed the jury, "Within these instructions I have defined certain words and phrases. If so, you are to use those definitions in your deliberations. If I have not defined a word or phrase, you should apply the common ordinary [meaning] of that word or phrase." We assume the jury used the common and ordinary meanings of "unreasonable," "reasonable," and "force" in deciding whether the measure of force that Scherz used was unreasonable. *See Gulbertson*, 843 N.W.2d at 248 ("We presume that juries follow instructions given by the court." (quotation omitted)); *Peou*, 579 N.W.2d at 475 ("[We] assume that the jurors were intelligent and practical people.").

Contrary to Scherz's assertion, the jury *was* instructed that parents and caretakers may use certain force on children. The district court stated,

> The Defendant is not guilty of a crime if the Defendant used reasonable force upon or toward [K.J.] without the

> child's consent when circumstances existed, or the Defendant reasonably believed circumstances existed as follows:
>
> When used by a parent, legal guardian, or other caretakers of a child in the exercise of lawful authority, to restrain or correct the child.

This instruction follows the language in Minnesota Statutes section 609.06, subdivision 1(6), which Scherz cites to in her brief. And the instructions as a whole are in language that the jury can understand. *See Peou*, 579 N.W.2d at 475 (holding that if the instructions correctly state the law "in language that can be understood by the jury, there is no reversible error").

Because the district court's instructions on malicious punishment fairly and adequately explain the law of the case, the instructions are not erroneous. *See Broulik*, 606 N.W.2d at 68.

In addition, Scherz cannot show that any alleged error affected her substantial rights. Scherz did not argue to the jury that the punishment was reasonable to restrain or correct K.J. At trial, Scherz's theory was that she was not a parent, legal guardian, or caretaker of K.J. and that it was Jensen, and not Scherz, who administered the punishment. The district court's instructions on malicious punishment do not conflict with Scherz's theory of the case.

## B. Domestic Assault

Scherz claims that, in the domestic-assault instructions, the jury should have been "advised that [she] had the right to use reasonable force, even if it caused pain to K.J., if part of legitimate parental discipline." But the jury was already instructed that Scherz could use reasonable force. "When the substance of a particular instruction is already

8

contained in the trial court's instructions to the jury, the court is not required to give an additional requested instruction." *Id.* at 71.

Even though the reasonable-force instruction was given during the elements for malicious punishment of a child, the district court also instructed the jury to "consider these instructions as a whole and regard each instruction in light of all the others." It further informed the jury that "[t]he order in which the instructions are given is of no significance and you're free to consider the issues in any order that you wish." We assume that the jury followed these instructions. *See Gulbertson*, 843 N.W.2d at 248 (holding that district court did not err when it provided the definition of domestic abuse as part of the second element of the crime, but did not restate the definition as part of the third element). The district court properly instructed the jury on domestic assault.

In addition, as discussed above, Scherz cannot meet the third prong of plain-error review, that the alleged error prejudiced her. Scherz's theory of the case rested on an opposite assertion—that she was not a caretaker and was not involved in the punishment.

## II. Sufficiency of the Evidence

Scherz next contends that the evidence was insufficient to convict her. In reviewing this claim, we determine whether the evidence, "when viewed in the light most favorable to the conviction, was sufficient to allow a jury to reach a guilty verdict." *State v. Hurd*, 819 N.W.2d 591, 598 (Minn. 2012) (quotation omitted). We assume that the jury believed the state's witnesses and disbelieved any evidence conflicting with the guilty verdict. *Id.* If a conviction is based on circumstantial evidence, the circumstances proved by the state must be "consistent with guilt and inconsistent with any rational

9

hypothesis except that of guilt." *State v. Silvernail*, 831 N.W.2d 594, 599 (Minn. 2013) (quotation omitted).

### A. Malicious Punishment

Scherz claims that the punishment that occurred was not malicious punishment within the meaning of the statute and that Scherz did not seek to injure or harm K.J.

"A parent, legal guardian, or caretaker who, by an intentional act or a series of intentional acts with respect to a child, evidences unreasonable force or cruel discipline that is excessive under the circumstances is guilty of malicious punishment of a child." Minn. Stat. § 609.377, subd. 1. "If the punishment results in less than substantial bodily harm," the offense is a gross misdemeanor. *Id.*, subd. 2. The state is not required to prove bodily harm for a conviction under this statute. *State v. Broten*, 836 N.W.2d 573, 577 (Minn. App. 2013), *review denied* (Minn. Nov. 12, 2013).

K.J.'s testimony about what occurred is direct evidence, which we assume the jury believed. *See State v. Clark*, 739 N.W.2d 412, 421 n.4 (Minn. 2007) ("Direct evidence is evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." (quotations omitted)). Not only did Scherz make K.J. change into shorts and hold a chair above her head while kneeling for two hours, but she also hit K.J. several times with a wooden spoon while K.J. was holding the chair. K.J.'s body was "[s]ore" and "[h]urt," and she said it felt like she was "[run] over by a truck." K.J. seemed distraught as a result of the punishment as evidenced by her decision

to run away.[1]  The next morning, Scherz forced K.J. to wear the "I am a thief" shirt to school to humiliate K.J.  K.J. was 13 years old when the punishment occurred, and the punishment was inflicted because K.J. had taken and worn some of Scherz's clothes without asking.

A reasonable jury could determine that this punishment was unreasonable force or cruel discipline that was excessive in light of these circumstances.  The malicious-punishment statute does not require Scherz to have intended to hurt K.J.; it only requires an intentional act or series of acts.  *See* Minn. Stat. § 609.377, subd. 1.  The evidence is sufficient to uphold Scherz's conviction for malicious punishment.

### B.     Domestic Assault

Scherz only contests the intent element of the assault conviction.  A person is guilty of misdemeanor domestic assault against a family or household member if he or she "(1) commits an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflicts or attempts to inflict bodily harm upon another."  Minn. Stat. § 609.2242, subd. 1.

The first form of assault under this statute is assault-fear, which is a specific-intent crime that requires the state to prove that the defendant intended to cause a particular result, namely fear of immediate bodily harm or death.  *See State v. Fleck*, 810 N.W.2d 303, 308–10 (Minn. 2012) (construing substantively identical language in Minn. Stat.

---

[1] Scherz mischaracterizes K.J.'s stated reason for running away.  K.J. did not testify that she left the home because of the "I am a thief" shirt.

11

§ 609.02, subd. 10). The second form of assault is assault-harm, which is a general-intent crime, requiring the state to prove that the defendant intended to do the physical act. *Id.*

Intent is "an inference drawn by the jury from the totality of circumstances." *State v. Fardan*, 773 N.W.2d 303, 321 (Minn. 2009) (quotation omitted). "A jury is permitted to infer that a person intends the natural and probable consequences" of his or her actions. *State v. Johnson,* 616 N.W.2d 720, 726 (Minn. 2000).

Based on the evidence at trial, the jury could reasonably conclude that Scherz acted with the intent to cause K.J. to fear immediate bodily harm or acted with the intent to do the physical act of hitting K.J. The state was not required to prove that Scherz intended to cause the result of bodily harm to K.J. *See Fleck*, 810 N.W.2d at 308–09.

### III.    Ineffective Assistance of Counsel

Scherz lastly contends that the district court abused its discretion by concluding that she is not entitled to relief on grounds of ineffective assistance of counsel.

"We review a postconviction court's legal conclusions de novo, and its factual findings for clear error." *State v. Hokanson*, 821 N.W.2d 340, 357 (Minn. 2012). We review claims of ineffective assistance of counsel de novo. *Dobbins v. State*, 788 N.W.2d 719, 728 (Minn. 2010). To be entitled to postconviction relief, Scherz must establish that her trial counsel's "representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotation omitted). A "strong presumption" exists that an attorney's performance was reasonable. *Hokanson*, 821 N.W.2d at 358.

12

Scherz argues that her trial counsel failed to "explore the possibility of" calling a medical expert to testify about K.J.'s bruising; did nothing to challenge "the plausibility of the timeline presented by K.J."; and failed to object to the state's redirect as leading. But the presentation of evidence and decisions about cross-examination and objections at trial are matters of trial strategy. *Dobbins*, 788 N.W.2d at 731; *Francis v. State*, 781 N.W.2d 892, 898 (Minn. 2010) (noting that whether to cross-examine state's expert witness was trial strategy); *Leake v. State*, 737 N.W.2d 531, 542 (Minn. 2007) ("Decisions about objections at trial are matters of trial strategy."). We will not review challenges to trial strategy. *Dobbins*, 788 N.W.2d at 731.

Scherz also asserts that an evidentiary hearing is required to determine "whether her trial counsel's pending charge for filing a false income tax return interfered with his effectiveness at trial." Scherz alleges only generally that her trial counsel's pending charge affected her trial; she does not explain how her trial counsel was impaired or point to evidence showing that the alleged charges affected counsel's professional performance during Scherz's criminal case. *See State v. Smith*, 476 N.W.2d 511, 517 (Minn. 1991) (rejecting per se rule that representation by a suspended attorney violates the right to counsel and holding that, while the attorney's "misconduct was serious, meriting disbarment, it was unrelated to [his] representation of defendant and was not so egregious as to infect the trial and undermine its reliability"). Scherz's claim of ineffective assistance of counsel is therefore unavailing.

**Affirmed.**

13